# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED

SEP 1 9 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

|  |  |
|---|---|
| In the Matter of the Search of<br><br>YAHOO! INCORPORATED EMAIL ACCOUNT<br>c1stanley@yahoo.com | )<br>)<br>)<br>)<br>)<br>) |

2: 1 6 - SW - 5 7 6   CKD

Case No.

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1349 | Conspiracy |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☑ Delayed notice ___88___ days (give exact ending date if more than 30 ___12/16/2016___ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Benjamin Paulin, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/19/2016

_____
*Judge's signature*

City and state: Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge

**<u>Attachment A</u>**

**Description of Property to be Searched**

     This warrant applies to information associated with **c1stanley@yahoo.com** that is stored at premises owned, maintained, controlled, or operated by Yahoo!, Incorporated, a company headquartered at 701 First Avenue, Building D, Sunnyvale, California.

## Attachment B

## Description of Items to be Seized

### I.  Information to be disclosed by Yahoo!, Incorporated

This affidavit is in support of an application for a warrant to search information described in Attachment A that is within the possession, custody, or control of Yahoo!, Incorporated (Yahoo!), including any electronic mail (e-mail), records, files, logs, or information that have been deleted but are still available to Yahoo!, or have been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f).  Yahoo! is required to disclose the following information to the government for each account or identifier listed in Attachment A:

   a.  The contents of all e-mails, including attachments thereto, associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination address associated with each email, the date and time at which each e-mail was sent, and the size and length of each e-mail;

   b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the Internet Protocol (IP) address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number used for payment);

   c.  Any deleted e-mails, including any information described in subparagraph "a" above.

   d.  All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, histories, profiles, calendar data, pictures, and files; and

   e.  All records pertaining to communications between Yahoo! and any person regarding the account, including contacts with support services and records of actions taken.

### II.  Information to be seized by the Government

Information described in Section I of this Attachment B which constitutes evidence of violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud), and/or 1349 (Conspiracy to Commit Mail/Wire/Bank Fraud), specifically including, for each account or identifier listed on Attachment A, information pertaining to the following matters for the time periods January 1, 2013 through the present, unless otherwise noted:

Attachment B

a. Any and all records and information relating to Safe Credit Union ("Safe");

b. Any and all records and information involving or relating to amounts due and payable to the clients of Creditors Specialty Service, Incorporated ("CSS"), disputes relating to same, and/or CSS's attempts to resolve such disputes;

c. Any and all records and information involving or relating to the financial condition of Charles Stanley ("STANLEY") and/or CSS. This documentation could include tax returns, bank statements, financial statements, general journals, and/or general ledgers;

d. Any and all records and information indicating, or tending to indicate, that CSS/STANLEY has intentionally withheld payments due to clients;

e. Any and all records and information involving or relating to the deletion of client records, and/or the altering/changing of client codes;

f. All records and information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the Internet Protocol (IP) address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number used for payment); and

g. All records and information pertaining to communications between Yahoo! and any person regarding the account, including contacts with support services and records of actions taken.

As used above, the terms "records" and "information" includes correspondence, photographs, audio and video files, attachments, or any other evidence regardless of the form it was created.

Attachment B

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT FOR YAHOO! ACCOUNT

I, Benjamin L. Paulin, being duly sworn, do hereby state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at a premises owned, maintained, controlled, or operated by Yahoo!, Incorporated ("Yahoo!"), an electronic mail ("email") provider headquartered at 701 First Avenue, Sunnyvale, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Yahoo! to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Sacramento Division. I have been employed in such capacity and assigned to investigate white collar crimes since March 2010. As part of my duties and responsibilities, I investigate violations of the laws of the United States of America, including wire fraud, mail fraud, securities fraud, bank fraud, money laundering, identity theft, and other financial crimes. In that capacity I have served as the lead agent, and have assisted other agents, in fraud investigations.

3.    I was assigned to this investigation in August 2016. I am familiar with the facts and circumstances of this investigation. The information set forth in this affidavit was obtained through my training and experience, communications with others who have knowledge of the events and circumstances described herein, and a review of records related to this investigation.

### A.    Purpose of Affidavit

4.    This affidavit is made in support of an application for a warrant to search Yahoo! email account **c1stanley@yahoo.com**, as further described in Attachment A, for evidence of violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344

1

(Bank Fraud) and/or 1349 (Conspiracy to Commit Mail/Wire/Bank Fraud), specifically those items listed in Attachment B.

     5.     Because this affidavit is being submitted for the limited purpose of obtaining a search warrant for Yahoo! email account **c1stanley@yahoo.com**, I have included only the facts I believe are necessary to establish probable cause that evidence related to violations of 18 U.S.C. §§ 1341 1343, 1344, and/or 1349 are contained in Yahoo! email account **c1stanley@yahoo.com**. I have not included each and every fact known to me concerning this investigation. Except where otherwise indicated, conversations are reproduced in summary and in part. Where dates, figures, times, and/or calculations are set forth in this affidavit, they are approximate, unless noted otherwise.

     **B.**     **Statutory Authority**

     6.     Pursuant to 18 U.S.C. § 1341 it is a crime when a person, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting to do so . . . deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing."

     7.     Pursuant to 18 U.S.C. § 1343 it is a crime when a person, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."

     8.     Pursuant to 18 U.S.C. § 1344 it is a crime when a person, "knowingly executes, or attempts to execute, a scheme or artifice to defraud a financial institution".

     9.     Pursuant to 18 U.S.C. § 1349 it is a crime when a person, "attempts or conspires to commit any offense under this chapter."

## C.    Summary of Investigation

10.    Information obtained during the course of this investigation indicates that multiple violations of 18 U.S.C. §§ 1341, 1343, 1344, and/or 1349, have been committed by the user of Yahoo! email account **c1stanley@yahoo.com**.  The user of this email account, Charles STANLEY ("STANLEY"), currently owns and operates Creditors Specialty Service, Incorporated ("CSS"), a credit collection agency based in Acton, California.  In December 2006, CSS entered into a credit collection agreement with Safe Credit Union ("Safe") a federally-insured credit union based in Folsom, California.[1]  This agreement called for CSS to collect on certain debts due to Safe.  CSS was expected to remit payment to Safe on a monthly basis.  CSS was to receive a contingent fee in exchange for the services they provided to Safe.

11.    In or around September 2013, CSS began to default on monthly payments due to Safe.  Safe filed civil suit against CSS in April 2014 as a result of CSS's continued failure to remit payments to Safe.  Shortly thereafter, Safe's civil counsel advised CSS/STANLEY to cease all collection activity on Safe's accounts.  Nonetheless, CSS/STANLEY appears to have continued its collection efforts in relation to these accounts after being repeatedly advised to cease its collection activity in relation to these accounts, and therefore has obtained money from debtors through false pretenses or misrepresentations.  In furtherance of this activity, CSS appears to have made repeated false declarations to Safe and/or Safe's debtors.  CSS also appears to have taken steps to delete evidence of unauthorized collections relating to Safe's accounts.

## II.   FACTS SUPPORTING PROBABLE CAUSE THAT STANLEY COMMITTED MAIL/WIRE/BANK FRAUD

### A.    Brief History of CSS's Interactions with Safe

12.    Safe provides loans or credit to consumers, and holds consumer debt.  Safe sometimes contracts with third-parties to service the debt it holds—i.e., interact with debtors, collect the debt, and determine the balance owed by the debtors after subtracting payments received by the servicer.

---

1 Safe's corporate offices are located within the State and Eastern District of California.

13.     CSS is a company that provided collection services to financial and other institutions holding consumer debt.[2] As discussed in more detail below, based on my review of records obtained from public filings and my discussions with representatives of Safe, CSS maintained an electronic database of the collection accounts that it serviced. CSS assigned codes to these accounts. These codes corresponded to the clients on whose behalf CSS was collecting debt.

14.     On or around December 15, 2006, CSS and Safe entered into a credit collection agreement. This agreement called for CSS to receive a 30% standard fee on collections made on Safe's behalf. The agreement also called for amounts collected by CSS on behalf of Safe's clients to be remitted to Safe, less the collection fee, on a monthly basis. STANLEY appears to have signed this agreement on behalf of CSS. Safe relied on CSS to provide accurate and complete reports of the amounts collected from debtors by CSS on Safe's behalf.

15.     On August 26, 2016, I interviewed N.R., who was then employed as a Recovery Manager with Safe.[3] N.R. advised that Safe stopped sending new collection accounts to CSS in or around 2011. Prior to 2011, Safe worked with two separate credit collection agencies, to include CSS. During this period of time, Safe typically distributed 50% of their collections to CSS, and 50% of their collections to another collection agency. N.R. advised that STANLEY was Safe's main point of contact at CSS.

16.     N.R. advised that prior to 2013, CSS generally made their payments to Safe when they were due. In or around 2013, CSS began to fail to make their required payments to Safe. N.R. noted that CSS continued to fall more and more behind as the year went on. Safe's attempt to collect on the amounts due ultimately led to the filing of a civil action against CSS.

---

2 On September 13, 2016, I placed a telephone call to (661) 269-0100. An internet search for information related to CSS identified this telephone number as a number associated with CSS. On September 13, 2016, my call was answered by an apparent representative of CSS, who responded to my call with the greeting, "good afternoon CSS." It appears, based on the foregoing, that CSS remained in operation as of September 13, 2016.

3 A.C. and P.R., who were then employed by Safe, were also present for this interview. Since the vast majority of the information provided during this interview was provided by N.R., the statements made during this interview have been attributed to N.R. in this affidavit.

4

17.     N.R. advised that CSS has collected approximately $800,000 from Safe's debtors without authorization.  CSS did not report this collection activity to Safe.  Since these collections were not reported to Safe, the payments made on the associated loans did not reduce the balance shown as due and payable on these loans.  As a result, Safe did not receive the funds they were due as a result of these collections, and some of their members have not received credit for the payments they've made.

**B.      History of Safe's Dispute with CSS**

**18.     Fall of 2013 – Spring of 2014**

19.     On or around September 24, 2013, N.R. met with STANLEY to discuss CSS's failures to make their payments when due.[4]

20.     On or around January 27, 2014, a law firm acting on Safe's behalf sent a payment demand letter to CSS.  This letter indicates that CSS had failed to make payments due to Safe in August, September, October, November, and December of 2013.[5]

21.     On April 9, 2014, Safe filed suit against CSS/STANLEY in Sacramento, California.[6]

22.     On or around May 14, 2014, R.W.,[7] who is/was representing Safe in the suit filed against CSS, spoke to STANLEY.  During this conversation, R.W. demanded that CSS cease all collection activities in relation to these accounts.[8]

23.     On or around May 28, 2014, R.W. sent an email to STANLEY.  In this email, R.W. advised STANLEY that Safe intended to terminate its business relationship with CSS.[9]

**Summer of 2014 – Winter of 2015**

24.     In a declaration filed in connection with the civil suit Safe filed against CSS, R.W. recounted representations STANLEY made to him in reference to Safe's accounts.  These

---

4 See Sacramento County Superior Court 34-2014-00161605-233.
5 See Sacramento County Superior Court 34-2014-00161605-1.
6 See Sacramento County Superior Court 34-2014-00161605-1.
7 According to the California State Bar's website, R.W. was admitted to the State Bar of California in December 2005, and has not been the subject of any disciplinary or administrative actions.
8 See Sacramento County Superior Court 34-2014-00161605-17.
9 See Sacramento County Superior Court 34-2014-00161605-17.

representations appear to have been made between June 17, 2014 and July 3, 2014. In this declaration, R.W. advised that STANLEY represented that none of the Safe accounts were currently paying, with the exception of certain accounts previously reported to Safe.[10]

25.     On or around July 3, 2014, R.W. sent a final demand to STANLEY. This demand appears to have been sent to STANLEY by email, mail, and fax. This letter demanded the immediate return of all accounts Safe had assigned to CSS for collections.[11]

26.     A letter sent by R.W. recounted a conversation he had with STANLEY on or about July 17, 2014. In this letter, R.W. related that STANLEY agreed to send letters to Safe's account holders notifying them that CSS is no longer authorized to collect on Safe's behalf. R.W. also related that STANLEY agreed that this letter to be issued by CSS would direct Safe's account holders to remit all future payments to Safe. According to the letter issued by R.W., STANLEY made these representations to Safe on or around July 17, 2014.[12]

27.     On or around August 1, 2014, R.W. sent a letter to STANLEY. This letter appears to have been sent to STANLEY by email, mail, and fax. This letter reiterated that CSS was no longer authorized to collect on Safe's accounts.[13]

28.     On or around August 21, 2014, Safe began to issue letters to its debtors. These letters advised Safe's debtors that CSS was no longer authorized to collect on Safe's behalf. These letters were issued in batches beginning on August 21, 2014 and ending on August 29, 2014.[14]

29.     In a court declaration executed on December 9, 2014, STANLEY stated that "CSS has ceased any activity of any kind on any matter relating to Plaintiff, Safe Credit Union ("Safe"), or as to any customer or account of Safe, since July, 2014." STANLEY appears to have signed this declaration, under penalty of perjury, on December 9, 2014.[15]

---

10 See Sacramento County Superior Court 34-2014-00161605-17.
11 See Sacramento County Superior Court 34-2014-00161605-17.
12 See Sacramento County Superior Court 34-2014-00161605-17.
13 See Sacramento County Superior Court 34-2014-00161605-17.
14 See Sacramento County Superior Court 34-2014-00161605-18.
15 See Sacramento County Superior Court 34-2014-00161605-25.

6

30.     On January 9, 2015, the Sacramento County Superior Court entered an order

granting Safe's motion for a preliminary injunction.  The superior court ordered CSS to refrain

from "collecting, compromising, settling or accepting money" in connection with any account

assigned to Safe to CSS.  This order also precluded CSS from representing that they were

"authorized to collect, compromise, settle or accept money on account of, or in connection with,

any of the SAFE Accounts."  The court further ordered CSS to "refrain from committing any act

that results or may result in the loss, destruction or alteration of any documents, records,

electronically stored information, computers, software, hardware and any other medium of

storage containing information that constitutes, evidences or relates to the SAFE Accounts or any

of the SAFE Property."[16]

## Spring of 2015 – Present Date

31.     In a court declaration executed on July 9, 2015, STANLEY stated that CSS "has

never maintained its records on Safe Accounts, in terms of the information and documents

requested in the special interrogatories and document requests at issue in this motion, in any

electronic form."  STANLEY appears to have signed this declaration under penalty of perjury,

on July 9, 2015.[17]

32.     STANLEY was deposed on August 13, 2015.  In this deposition, STANLEY was

asked a series of questions related to the preliminary injunction entered on January 9, 2015.  This

injunction precluded CSS from destroying any information pertaining to Safe's accounts.

During the deposition, Safe's counsel asked if CSS has "taken any steps to ensure that either

CSS or its attorneys refrain from attempting to enforce judgments on SAFE accounts?"  In

response, STANLEY advised that in January 2015, CSS "removed all of the accounts from the

computer systems so they cannot be touched, worked, seen, called, noticed.  Nothing can be seen

on these accounts."[18]

---

16 See Sacramento County Superior Court 34-2014-00161605-38.

17 See Sacramento County Superior Court 34-2014-00161605-86.

18 See Sacramento County Superior Court 34-2014-00161605-194.

7

33.     In a court filing made subsequent to STANLEY's deposition, CSS/STANLEY's counsel advised that Safe's electronic records were removed from CSS's computer system in mid-January of 2015. CSS/STANLEY's counsel stated that STANLEY deleted these records "to avoid any possible violation of the Preliminary Injunction by inadvertent communications on any Safe Account by a Debt Collector accessing the Debt Master Program." STANLEY appears to have signed a verification of the statements contained in this court filing, under penalty of perjury, on September 8, 2015.[19]

34.     On October 1, 2015, the Sacramento County Superior Court entered an order granting Safe's motion to compel electronic discovery.[20] This order authorized Safe to extract a forensic image of certain information pertaining to Safe's accounts. This forensic image was obtained/extracted from a CSS server on May 5, 2016.[21]

35.     On March 1, 2016, CSS/STANLEY turned over six boxes of documents to Safe's counsel. In a subsequent declaration, STANLEY advised that he had instructed his staff to print off these documents before he deleted Safe's account information from CSS's computer system in January 2015.[22] STANLEY advised that he discovered these documents in late-February of 2016, claiming that he did not discover them sooner because he assumed the copies had not been made despite his orders to do so. Stanley advised that the "entirety of the records deleted" from CSS's computer system were contained in these six boxes of records. STANLEY appears to have signed this declaration, under penalty of perjury, on March 2, 2016.

36.     On August 11, 2016, CSS filed for Chapter 11 Bankruptcy Protection in the Central District of California.[23]

37.     On August 12, 2016, the Sacramento County Superior Court granted Safe's motion for monetary and terminating sanctions, spoliation of evidence, violation of injunction, and abuse of discovery process. In the Court's ruling, it noted that "new evidence shows that

---

19  See Sacramento County Superior Court 34-2014-00161605-138.
20  See Sacramento County Superior Court 34-2014-00161605-178.
21  See Sacramento County Superior Court 34-2014-00161605-253.
22  See Sacramento County Superior Court 34-2014-00161605-228.
23  See CDCA 2:16-BK-20721.

defendants' representations throughout the discovery process have been knowingly false, that defendants intentionally destroyed Safe's account records in violation of Court orders, and that they continue to withhold critical documents that are highly relevant to Safe's claims." CSS was ordered to pay $86,977.50 towards Safe's attorney's fees and $11,598.75 for copying costs.[24]

### C. Apparent Misappropriation of Debtor Payments by CSS/STANLEY

38.    As explained above, beginning on or around May 2014 Safe or its agents repeatedly advised CSS/STANLEY to cease all collection activity related to Safe's accounts and CSS/STANLEY repeatedly advised Safe that all collection activity related to these accounts had ceased.  In spite of STANLEY's representations, as set forth below, there appears to be evidence that CSS has collected, or attempted to collect, on Safe accounts after July 2014, including through at least August 2016.  These collection activities may be continuing to this day because, as discussed below, there is evidence that CSS collected on accounts obtained from Safe but which were re-coded to indicate that the accounts belonged to CSS/STANLEY.

39.    In a court declaration, N.R. advised that Safe was contacted by another financial institution on or around October 2014.  This financial institution had received a mortgage loan application from a borrower whose account was assigned to CSS for collections.  This financial institution advised that this account was shown as delinquent on the borrower's credit report. The borrower's loan application was in jeopardy as a result of the reported delinquency. According to the borrower, CSS had resumed collection efforts in July 2014 and told the borrower that Safe had authorized these collection efforts.  Safe resolved this matter by assuring the potential lender that CSS's representations were false and that CSS had no authority to collect on Safe's behalf.[25]

40.    I have also reviewed a declaration made by R.W., which discusses Safe's review of the printed database records provided by CSS on March 1, 2016.[26]  In this declaration, R.W. noted that he reviewed 3,352 debtor history reports relating to Safe's accounts.  R.W. found that

---

24 See Sacramento County Superior Court 34-2014-00161605-275.
25 See Sacramento County Superior Court 34-2014-00161605-18.
26 See Sacramento County Superior Court 34-2014-00161605-233.

a date and time stamp which appears at the top of each report indicates that these documents
were printed between October 22, 2015 and November 1, 2015. I have reviewed multiple
exhibits which were attached to this declaration. In my review of these exhibits, I found multiple
reports which appear to have been printed from CSS's computer system between October 22,
2015 and November 1, 2015. This indicates that Safe records were kept in CSS's collection
database until at least November 2015.

41.     In court declarations and depositions, STANLEY made varying representations in
regard to CSS's electronic records. In July 2015, as previously noted above, STANLEY
represented that CSS "has never maintained its records on Safe Accounts, in terms of the
information and documents requested in the special interrogatories and document requests at
issue in this motion, in any electronic form." In August 2015, STANLEY represented that CSS
did maintain electronic records relating to Safe's accounts, but STANLEY deleted these records
in January 2015. STANLEY represented that he deleted this information in order to avoid any
inadvertent collection activity relating to these accounts. As noted in the preceding paragraph,
there are strong indications that CSS maintained electronic records relating to Safe's accounts
until at least November 2015. I believe that the apparent misrepresentations STANLEY made in
relation to CSS's electronic records were intended to conceal CSS's continued collections on
Safe accounts after May 2014.

42.     As previously noted above, Safe's motion to compel electronic discovery was
granted on October 1, 2015. On May 5, 2016, a forensic examiner conducted an examination of
a CSS computer server. During this examination, the forensic examiner obtained a forensic
copy, or mirror image, of the information contained on the CSS server as of May 5, 2016. At a
later date, R.W., Safe's civil counsel, directed the forensic examiner to conduct a search of the
information extracted from this server. R.W. specifically instructed the forensic examiner to
search for nine client codes, which had been used to identify accounts which had been assigned
to CSS by Safe. The forensic examiner was informed that approximately 3,600 accounts
assigned to CSS by Safe had been assigned one of these nine client codes. In an attempt to

10

identify information pertaining to the accounts Safe had assigned to CSS for collections, the forensic examiner queried the system for information pertaining to the nine client codes. After conducting his search, the forensic examiner was only able to locate records relating to three Safe accounts. As noted above, CSS had previously provided (on March 1, 2016) records pertaining to approximately 3,352 accounts assigned to CSS by Safe.[27]

43.     The forensic examiner also searched for information pertaining to specific account names and account numbers. These account names and account numbers were previously assigned one of the nine client codes which correspond to Safe. Information pertaining to these accounts had been included in the six boxes of documents CSS/STANLEY provided to Safe on March 1, 2016. After conducting a search of CSS's database for these identifiers, Safe's forensic examiner was able to locate approximately 260 accounts which were assigned to CSS by Safe. These accounts were listed in the CSS database under client codes attributable to CSS and/or STANLEY.[28]

44.     In a declaration, R.W. noted that these re-coded accounts, which represented approximately 10% of the accounts assigned to CSS by Safe, experienced a high volume of collection activity. R.W. noted that approximately $330,877.23 had been collected on these Safe accounts from January 1, 2013 through May 5, 2016.[29]

_____

27 During his examination, the forensic examiner found evidence that a number of records previously contained in CSS's debt collection database were permanently deleted from this computer system on November 4, 2015. It appears possible, given the facts known to your Affiant at this time, that the records deleted from CSS's system on November 4, 2015 could have related to another client. My belief however, is that the records deleted from CSS's computer system on November 4, 2015 were records relating to certain Safe accounts. This belief is partially based on the facts and circumstances outlined above. As noted in the preceding paragraph, CSS provided records pertaining to approximately 3,352 Safe accounts on March 1, 2016. These records contained an imprinted timestamp which indicated that they were printed between October 22, 2015 and November 1, 2015. Since only 3 of the approximately 3,352 Safe accounts could be located under Safe's client codes on May 6, 2016, it appears that information pertaining to these accounts was deleted and/or moved between October 22, 2015 and May 6, 2016. Given the apparent fact that multiple account records were deleted from CSS's computer system on November 4, 2015, it appears reasonable to believe that multiple records pertaining to Safe's accounts were deleted from the system on this date. In addition to finding evidence that certain records were deleted from CSS's computer system on November 4, 2015, the forensic examiner also found evidence that the client codes pertaining to a small number of accounts assigned to CSS by Safe were changed from Safe's client codes to client codes corresponding to CSS/STANLEY. This discovery is discussed in further detail in the following paragraphs.
28 See Sacramento County Superior Court 34-2014-00161605-254.
29 See Sacramento County Superior Court 34-2014-00161605-254.

45.     I have reviewed multiple exhibits which were attached to R.W.'s declaration. These exhibits appear to contain numerous examples of CSS collecting regular payments from the Safe accounts after July 2014, when STANLEY represented that CSS had ceased collecting money from debtors on behalf of Safe, where the accounts were assigned codes for clients other than Safe.

46.     During my review of the exhibits attached to R.W.'s declaration, I also noted numerous examples of instances where CSS had settled the accounts for less than the amount owed.  On September 14, 2016, I interviewed N.R., who was then employed as a Recovery Manager with Safe.  During this interview, N.R. advised that Safe and CSS did not have a standing agreement that would allow CSS to accept a settlement for less than the amount owed. N.R. stated that all proposed settlements were evaluated on an individual basis.  N.R. further advised that all proposed settlements were reviewed by executive management at Safe.  When asked if Safe would have approved a settlement offer proposed by CSS after July 2014, N.R. stated that she was "100% certain that didn't happen."  In spite of this, I noted multiple examples of instances where CSS had accepted a settlement after July 2014, purportedly on behalf of Safe.

47.     During my review, I noted a CSS account log that listed the following entries for April 2, 2015: "DTO I WENT OVER BILL OFFERED 15K TO SIF HE SAID ARE YOU KIDDING YOU JUST SAID PRIN 10,900 ASKED IF HE HAD THAT HE SAID ARE YOU KIDDING AGAIN TOLD HIM I WAS NOT KIDDING HE SAID HE HAS SEEN BBB COMPLAINTS HE WILL GO THAT ROUTE AND HUNG UP."  A subsequent call, which appears to have taken place on the same date, was logged in the following entry: "DTR SD HE WAS TOLD TO ONLY PAY HALF OF THE PRINC AND HE SHOULD ONLY OWE $3,732 WENT OVER THE ACCOUNT WITH CS AAND [sic] HE SAID TO TAKE THE $ AND RUN.. EMAIL."  I believe that the reference to "CS" is a reference to Charles STANLEY, and that the message indicates that STANLEY sent an email to the CSS employee instructing him/her to take the money from the debtor as a settlement.

48.     Another entry made on the same date appears to relate to correspondence sent to the debtor executing STANLEY's instruction. A portion of this entry reads, "Pursuant to our conversation Creditor's Specialty Service, Inc. **is authorized by Safe Credit Union** [emphasis added] to accept $3,732.00 as settlement in full. This settlement becomes void if funds are not received by April 2, 2015." A subsequent entry made on this same date notes that a $3,732.00 payment was posted to the client's account on this date. As previously noted above, CSS was not authorized to collect on Safe's accounts after July 2014, and was not authorized to accept partial settlements without receiving prior approval from Safe. This settlement was accepted after July 2014, during a period where N.R. is "100% certain" Safe would not have provided their approval for any settlements proposed by CSS.

49.     I also noted another example of CSS accepting a deeply discounted settlement on a Safe account. This settlement appears to have been entered into in June 2015. When reviewing the account statement related to this account, I noted that the statement indicated that the account had been paid in full. The account log listed the following entries on June 11th and 12th, 2015: 06/11/2015 – "[Redacted from document I reviewed] CALLED IN SD THAT WE ARE HOLDIN GUP HIS CLIENT FROM BUYING HIS FIRST HOME. TOLD HIM I WILL SIF FOR $6500 IN 1 PAYMENT SD HIS CLIENT HAS NO $ AND WILL SEE WHAT HE WANTS TO DO." Another entry made on the same date appears to relate to correspondence sent to the debtor. A portion of this entry reads, "Pursuant to our conversation Creditor's Specialty Service, Inc. **is authorized by Safe Credit Union** [emphasis added] to accept $6,500.00 as settlement in full. This settlement becomes void if funds are not received by June 15, 2015." Approximately 50 minutes later, another entry was made. This entry reads, "Pursuant to our conversation Creditor's Specialty Service, Inc. **is authorized by Safe Credit Union** [emphasis added] to accept $2,500.00 as settlement in full. This settlement becomes void if funds are not received by June 12, 2015." Another entry made on June 12, 2015 notes that a $2,500 payment was posted to the account on this date.

13

50.     There are indications that CSS's unauthorized collection activity may be continuing to this day. When interviewed on September 14, 2016, N.R., who was then employed as a Recovery Manager with Safe, related a recent conversation she had with a Safe debtor. This debtor's account had been assigned to CSS for collection. This debtor advised N.R. that he has remitted multiple payments to CSS, and that he made his last payment to CSS in August 2016.

51.     When interviewing N.R. on September 14, 2016, I asked N.R. why debtors would continue to pay CSS after receiving a letter in August 2014, which, as previously noted above, advised debtors that CSS was no longer authorized to collect on Safe's behalf. In response to my question, N.R. advised that a number of the letters Safe issued to its debtors came back as undeliverable, so certain debtors may not have received the notification that CSS was no longer authorized to collect on Safe's behalf. Other debtors may have been pressured into making continued payments to CSS. N.R. advised that she received a telephone call from a debtor in 2014. This member advised N.R. that he had received the letter informing members that CSS was no longer authorized to collect on Safe's behalf. During their conversation, N.R. advised the member to stop paying CSS. At a later point in time, R.W. requested that Safe contact certain debtors who were continuing to make payments to CSS. The individual N.R. telephonically advised to stop making payments to CSS was one of these debtors. N.R. advised that she contacted this debtor and asking him why he continued to make payments to CSS after she told him not to. In response, the debtor advised that he continued to pay CSS because they scared him. The debtor advised N.R. that CSS threatened to take his home. N.R. advised that this debtor's experience was not atypical. Other debtors have related similar experiences to N.R. and/or Safe.

**D.     Other Relevant/Related Conduct**

52.     On September 7, 2016, I interviewed R.W. R.W. advised that he had reviewed information extracted from CSS's server on May 5, 2016. R.W. stated that his review of CSS's client database indicated that CSS had received approximately $1.7 million from debtors during

14

the time period beginning August 2015 and ending May 2016. R.W. advised that CSS appears to have remitted approximately $200,000 to clients over the same time period.[30]

53.     STANLEY's criminal history includes an April 2002 arrest California Penal Code Section 136.1 (Dissuading a Witness or Victim). This case appears to have been dismissed due to a lack of sufficient evidence. In November 2011, STANLEY pled guilty to a violation of California Penal Code Section 476 (Check Fraud), and was sentenced to three years probation.

54.     Based on the foregoing, it is my belief that STANLEY, directly or through employees of CSS, has fraudulently obtained money from debtors by claiming, or implying, that CSS was authorized to collect on Safe's behalf. These representations induced borrowers to remit funds to CSS. Per CSS's agreement with Safe, a portion of these funds should have been paid to Safe in accordance with their collection agreement. CSS has failed to report certain payments they received from debtors to Safe, which means that payments, which were intended to reduce the balance owed on outstanding loans, were not reported to the lender. I believe these actions represent possible violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud) and/or 1349 (Conspiracy to Commit Mail/Wire/Bank Fraud). It is my further belief, based on the foregoing, that STANLEY caused records to be deleted or altered in CSS's database in an effort to conceal evidence of this fraud.

### E.     Potential Loss to Safe

55.     On September 14, 2016, I interviewed N.R., who was then employed as a Recovery Manager at Safe. During this interview, N.R. advised that Safe will honor any payments made by its debtors to CSS. N.R. noted that a letter sent by Safe to its members in August 2014 expressly stated that Safe would honor payments which had been made to CSS up to that point in time. These payments will be honored even if Safe has not received the amount owed to them by CSS. As previously noted above, N.R. has advised me that CSS has collected approximately $800,000 from Safe's debtors without authorization.

---

30  Assuming the 30% contingent fee CSS changed to Safe was typical of the fees CSS charged for such services, CSS would be expected to remit approximately $1.2M on $1.7M in collections ($1.7M x 30%).

**F.      Use Of The Wires and Mails**

56.      With respect to the foregoing fraudulent conduct by CSS/STANLEY,

CSS/STANLEY sent, or caused to be sent, items by mail or common carrier.  These items would

potentially include checks sent to CSS from debtors, and correspondence sent to the debtors by

CSS.  CSS/STANLEY also sent emails relating to the activity described above.  CSS/STANLEY

also accepted credit card payments from Safe's account holders that were electronically

processed.  My belief, which is based upon my training and experience and consultations with

other criminal investigators, is that some, if not all, of these emails and/or credit card transactions

were transmitted through interstate commerce.

**G.      Conclusion of Probable Cause**

57.      Based on the foregoing, I believe that there is probable cause to believe that

STANLEY engaged in a mail/wire/bank fraud scheme and otherwise committed violations of 18

U.S.C. §§ 1341, 1343, 1344, and/or 1349.

**III.    ADDITIONAL FACTS SUPPORTING PROBABLE CAUSE THAT EVIDENCE
         WILL BE FOUND WITHIN STANLEY'S YAHOO! EMAIL ACCOUNT**

58.      I believe that evidence of the fraud scheme described above may be found in the

email account **c1stanley@yahoo.com**.  This opinion is based on my review of witness

statements, email correspondence, and business records.

59.      As noted, it appears that CSS was collecting on Safe accounts as recently as

August 2016.  Further, my review of business records has revealed instances where STANLEY

communicated with employees of CSS relating to collection on Safe accounts.  This includes one

instance of STANLEY directing a CSS representative to accept a deeply discounted settlement

offer on a Safe account after STANLEY had represented (to Safe and/or Safe's counsel) that

CSS had stopped collecting on the Safe accounts.  In this instance, the CSS representative noted

in the account log that he/she "WENT OVER THE ACCOUNT WITH CS AAND [sic] HE

SAID TO TAKE THE $ AND RUN..**EMAIL**." (emphasis added).

60.      In order to direct these activities, STANLEY needed to have a medium to

communicate with his co-conspirators and other parties.  From my training, experience, and

16

conversations with other investigators, I also know that it is common for individuals involved in joint criminal activity to use email as a means to communicate with co-conspirators. This conclusion is supported by the evidence in this case described above regarding STANLEY's use of email correspondence to communicate with others concerning Safe's accounts.

61.     Additionally, in a deposition, STANLEY advised that he occasionally conducts business utilizing the email account **c1stanley@yahoo.com**.[31] I have noted at least one instance where an email was sent from this account to a CSS representative and Safe's counsel.[32] This document contained an email signature for STANLEY.

62.     From my training, experience, and information provided by other investigators, I have learned that Yahoo! provides a variety of online services, including email access, to the general public. Yahoo! allows subscribers to obtain email accounts, like **c1stanley@yahoo.com**, at the domain name www.yahoo.com. Subscribers obtain an account by registering with Yahoo!. During the registration process, Yahoo! asks subscribers to provide basic personal information. Therefore, the computers of Yahoo! are likely to contain stored electronic communications (including retrieved and unretrieved email for Yahoo! subscribers) and information concerning subscribers and their use of Yahoo! services, such as account access information, email transaction information, and account application information.

63.     In general, an email that is sent to a Yahoo! subscriber is stored in the subscriber's "mail box" on Yahoo! servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Yahoo! servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Yahoo!'s servers for a certain period of time.

64.     When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to Yahoo!'s servers, and then transmitted to its end destination. Yahoo! often saves a copy of the email sent. Unless the sender of the email specifically deletes the email from the Yahoo! server, the email can remain on the system indefinitely. Even if the

---

31 See Sacramento County Superior Court 34-2014-00161605-194.
32 See Sacramento County Superior Court 34-2014-00161605-254.

sender deletes the email, it may continue to be available on Yahoo!'s servers for a certain period of time.[33]

65.     A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by Yahoo! but may not include all of these categories of data.

66.     A Yahoo! subscriber can also store files, including emails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Yahoo! to include electronic files stored in Yahoo! Briefcase files or Flickr photographs.

67.     Subscribers to Yahoo! might not store copies of the emails on their home/work computers but might store emails to their Yahoo! account. This is particularly true when they access their Yahoo! account through the internet, or if they do not wish to maintain particular emails or files at their residence or place of employment.

68.     In general, email providers like Yahoo! ask each of their subscribers to provide certain personal identifying information when registering for an email account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account numbers).

69.     Email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is active or closed), the methods used to connect to the account (such as logging into the account via Yahoo!'s website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the

---

[33] On August 31, 2016, I sent a letter to Yahoo! requesting that the company preserve records relating to account **c1stanley@yahoo.com**. Pursuant to Title 18, United States Code, Section 2703(f), receipt of such a letter requires Yahoo! to preserve records relating to this account for a period of 90 days.

account and the IP addresses associated with particular logins to the account. IP addresses information can be used to identify which computers or other devices were used to access the email account.

70.     In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communication.

71.     From my training, experience, and information provided by other investigators, I have learned that evidence of who was using an email account may be found in address books, contacts or buddy lists, emails in the account, and attachments to emails, including pictures and files.

72.     Based on the evidence identified above, I submit that there is probable cause to believe that CSS/STANLEY has engaged in a scheme to defraud Safe, a federally-insured financial institution. Further, I believe there is probable cause that evidence of the fraud scheme may be found in the email account that is the subject of this warrant.

## IV.   INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED—YAHOO! EMAIL ACCOUNT

73.     I anticipate executing the warrant for **c1stanley@yahoo.com** warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Section 2703(a), Section 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Yahoo! to disclose to the government copies of the records and other information (including the content of communications) particularly described in Attachment B.

## V.   REQUEST FOR SEALING AND DELAYED NOTICE

74.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this request for a search warrant, to include the search warrant itself. The affiant states that a criminal investigation regarding the above-

19

named individuals is on-going, documents, reports and interviews are being obtained and *BLP* contemplated, and further investigative activity is likely to take several months, *at least until December 16, 2016.*

75.     Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and they also disseminate them to other criminals as they deem appropriate (i.e., post them publicly online).  Premature disclosure of the contents of this affidavit would seriously impede this investigation by disclosing details of the government's investigation and evidence gathered in connection therewith.  There is reason to believe that disclosure of the contents of this affidavit or the existence of the search warrant will result in the destruction or tampering of evidence or intimidation of potential witnesses, flight from prosecution, changes in patterns of behavior, notification of confederates, or otherwise seriously jeopardize the ongoing investigation.

76.     Based upon the foregoing, I respectfully request that the Court issue an order instructing the email provider, Yahoo, Inc., not to notify any person notice of this warrant pursuant to Title 18, United States Code, Section 2705(b), except by further order of the Court.

## VI.  **CONCLUSION**

77.     Based upon the above mentioned facts, your affiant submits that there is probable cause to believe that the items set forth in Attachment B, which are evidence, contraband, fruits, and instrumentalities related to violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud), and/or 1349 (Conspiracy to Commit Mail/Wire/Bank Fraud) are contained in Yahoo! email account **c1stanley@yahoo.com**.  Based on the foregoing, I respectfully request that a search warrant be issued for the property identified in Attachment A and for the items specified in Attachments B.

I swear under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Benjamin L. Paulin
Special Agent
Federal Bureau of Investigation

Approved as to form:

Todd A. Pickles
Assistant U.S. Attorney

Subscribed and sworn to before me this _19_ day of September, 2016.

CAROLYN K. DELANEY
United States Magistrate Judge

21

## Attachment A

### Description of Property to be Searched

    This warrant applies to information associated with **c1stanley@yahoo.com** that is stored at premises owned, maintained, controlled, or operated by Yahoo!, Incorporated, a company headquartered at 701 First Avenue, Building D, Sunnyvale, California.

Attachment A

## Attachment B

## Description of Items to be Seized

### I.   Information to be disclosed by Yahoo!, Incorporated

This affidavit is in support of an application for a warrant to search information described in Attachment A that is within the possession, custody, or control of Yahoo!, Incorporated (Yahoo!), including any electronic mail (e-mail), records, files, logs, or information that have been deleted but are still available to Yahoo!, or have been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f).  Yahoo! is required to disclose the following information to the government for each account or identifier listed in Attachment A:

   a.   The contents of all e-mails, including attachments thereto, associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination address associated with each email, the date and time at which each e-mail was sent, and the size and length of each e-mail;

   b.   All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the Internet Protocol (IP) address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number used for payment);

   c.   Any deleted e-mails, including any information described in subparagraph "a" above.

   d.   All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, histories, profiles, calendar data, pictures, and files; and

   e.   All records pertaining to communications between Yahoo! and any person regarding the account, including contacts with support services and records of actions taken.

### II.   Information to be seized by the Government

Information described in Section I of this Attachment B which constitutes evidence of violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud), and/or 1349 (Conspiracy to Commit Mail/Wire/Bank Fraud), specifically including, for each account or identifier listed on Attachment A, information pertaining to the following matters for the time periods January 1, 2013 through the present, unless otherwise noted:

Attachment B

a.  Any and all records and information relating to Safe Credit Union ("Safe");

b.  Any and all records and information involving or relating to amounts due and payable to the clients of Creditors Specialty Service, Incorporated ("CSS"), disputes relating to same, and/or CSS's attempts to resolve such disputes;

c.  Any and all records and information involving or relating to the financial condition of Charles Stanley ("STANLEY") and/or CSS.  This documentation could include tax returns, bank statements, financial statements, general journals, and/or general ledgers;

d.  Any and all records and information indicating, or tending to indicate, that CSS/STANLEY has intentionally withheld payments due to clients;

e.  Any and all records and information involving or relating to the deletion of client records, and/or the altering/changing of client codes;

f.  All records and information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the Internet Protocol (IP) address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number used for payment); and

g.  All records and information pertaining to communications between Yahoo! and any person regarding the account, including contacts with support services and records of actions taken.

As used above, the terms "records" and "information" includes correspondence, photographs, audio and video files, attachments, or any other evidence regardless of the form it was created.

Attachment B

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) ) YAHOO! INCORPORATED EMAIL ACCOUNT c1stanley@yahoo.com ) ) ) ) | **SEALED** Case No. **2:16 - SW - 576 CKD** |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the          Eastern          District of          California
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before          October 3, 2016          *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐   for ____ days *(not to exceed 30)*  ☒ until, the facts justifying, the later specific date of     December 16, 2016     .

Date and time issued: 9/19/2016  12:55 pm                    _____
                                                              *Judge's signature*

City and state:     Sacramento, California                   Carolyn K. Delaney, U.S. Magistrate Judge
                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                              Date

## Attachment A

### Description of Property to be Searched

    This warrant applies to information associated with **c1stanley@yahoo.com** that is stored at premises owned, maintained, controlled, or operated by Yahoo!, Incorporated, a company headquartered at 701 First Avenue, Building D, Sunnyvale, California.

Attachment A

## Attachment B

### Description of Items to be Seized

**I.     Information to be disclosed by Yahoo!, Incorporated**

This affidavit is in support of an application for a warrant to search information described in Attachment A that is within the possession, custody, or control of Yahoo!, Incorporated (Yahoo!), including any electronic mail (e-mail), records, files, logs, or information that have been deleted but are still available to Yahoo!, or have been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f). Yahoo! is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    a.  The contents of all e-mails, including attachments thereto, associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination address associated with each email, the date and time at which each e-mail was sent, and the size and length of each e-mail;

    b.  All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the Internet Protocol (IP) address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number used for payment);

    c.  Any deleted e-mails, including any information described in subparagraph "a" above.

    d.  All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, histories, profiles, calendar data, pictures, and files; and

    e.  All records pertaining to communications between Yahoo! and any person regarding the account, including contacts with support services and records of actions taken.

**II.     Information to be seized by the Government**

Information described in Section I of this Attachment B which constitutes evidence of violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud), 1344 (Bank Fraud), and/or 1349 (Conspiracy to Commit Mail/Wire/Bank Fraud), specifically including, for each account or identifier listed on Attachment A, information pertaining to the following matters for the time periods January 1, 2013 through the present, unless otherwise noted:

a.  Any and all records and information relating to Safe Credit Union ("Safe");

b.  Any and all records and information involving or relating to amounts due and payable to the clients of Creditors Specialty Service, Incorporated ("CSS"), disputes relating to same, and/or CSS's attempts to resolve such disputes;

c.  Any and all records and information involving or relating to the financial condition of Charles Stanley ("STANLEY") and/or CSS.  This documentation could include tax returns, bank statements, financial statements, general journals, and/or general ledgers;

d.  Any and all records and information indicating, or tending to indicate, that CSS/STANLEY has intentionally withheld payments due to clients;

e.  Any and all records and information involving or relating to the deletion of client records, and/or the altering/changing of client codes;

f.  All records and information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the Internet Protocol (IP) address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number used for payment); and

g.  All records and information pertaining to communications between Yahoo! and any person regarding the account, including contacts with support services and records of actions taken.

As used above, the terms "records" and "information" includes correspondence, photographs, audio and video files, attachments, or any other evidence regardless of the form it was created.

Attachment B